[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
On October 1, 1991, the plaintiff Meadows Street Developers, Inc. (Meadows), a Connecticut corporation located in the Town of Montville, County of New London, owned 12 certain parcels of land with the buildings and improvements located thereon (subject property) situated on the northerly and southerly sides of Leffingwell Road in Montville (defendant) and described in Developer's Exhibit A. On December 18, 1991, Meadows conveyed title of the subject property to the plaintiff, Glen Meadows Limited Partnership (Glen Meadows), which has owned the subject property to the present day.
On October 1, 1991, the defendant's assessor valued the subject property for ad valorem tax purposes at a fair market value of $4,153,900 and assessed the subject property at a 70 percent value of $2,907,730. The plaintiffs amended their complaint to include the assessments on the lists of October 1, 1992, October 1, 1993 and October 1, 1994. The valuations and assessments have continued for all the years which are part of this appeal.
The plaintiffs instituted this appeal from the refusal of the defendant to change its assessment of the subject property for tax purposes as of October 1, 1991, and the years following which are part of this appeal.
The plaintiffs claim that the valuation of the subject property by the defendant's assessor was not that percentage of its true value on October 1, 1991, but rather, that it was grossly excessive, disproportionate and unlawful. The defendant denies plaintiff's claim.
The subject property is a privately owned residential complex consisting of 18 buildings with a total of 114 wood frame apartment units situated on eleven parcels of land ranging CT Page 11570 in size from .4 acres to 4.3 acres. There is also a small vacant parcel which provides access to the buildings that are set back from the street frontage. The total acreage involved is 12.08 acres.
The complex consists of 41 one-bedroom units, 33 two-bedroom units, 28 town house-style two-bedroom units with no finished basements and 12 town house-style two-bedroom units, with a finished basement family room. Plaintiff's Exhibit 1.
The property is serviced by utilities as follows: three artesian wells on the subject property, individual septic systems and electric, oil-fired furnaces for each building.
The subject property has good access to major highways and is located between the New York and Boston markets, with increasing population, good transportation facilities, a skilled labor force, good proximity to shopping, schools, and work places. The defendant should continue to be an attractive location for residential and business uses over the long term.
The subject property, though primarily in a light industrial zoning district, is a pre-existing legal non-conforming use. It is not adversely affected by Trading Cove Brook or wetland located in Flood Zone B (areas within the 500 year flood category). Plaintiff's Exhibit 1. Further, there are no known easements which affect the subject property.
The buildings on the subject property were in average condition as of October 1, 1991, with an interior bituminous concrete road system and parking areas maintained by the owner. Plaintiff's Exhibit 1, Defendant's Exhibit A.
On October 1, 1991, the subject property was a fully operational apartment complex which was the highest and best use of the subject property and continues as same to this day.
On October 21, 1988, the subject property was sold to John G. Dzyrik, Trustee for $6,000,000. Defendant's Exhibit F.
When Meadows purchased the subject property on October 21, 1988, it was subject to a Fleet National Bank (Fleet) mortgage of $4,880,000. Meadows assumed the note and Arnold Peck (Peck) who, with his wife, Roberta Peck, owned all the stock of Meadows, guaranteed the Fleet mortgage. Defendant's CT Page 11571 Exhibit H. On February 9, 1989, Fleet gave Meadows a mortgage on the subject property in the principal amount of $5,100,000. Defendant's Exhibit J.
In early 1989, Peck and Belfonte, who had no interest in Meadows at that time, owed joint and several obligations to Fleet of approximately $20,000,000. In the second quarter of 1989, Peck was put into involuntary bankruptcy by his creditors. Subsequently, all notes Peck owed to Fleet were in default, which included the $5,100,000 mortgage owed by Meadows and guaranteed by Peck. Thereafter, Peck, Belfonte and representatives of Fleet met to discuss the financial status of all the loans. As a result of the meeting, Belfonte agreed to manage all the projects he and Peck owned, including the subject property.
The purpose of the agreement of Belfonte with Fleet was that Belfonte, through his management company, MCR Property Management (MCR) would manage the Meadows to increase and stabilize the rental income and make capital improvements, if income permitted, so that the subject property could be sold or refinanced.
After managing the subject property, Belfonte became interested in purchasing it. He informed Fleet that he had a verbal commitment from Commercial Mortgage Corporation of Boston (Commercial mortgage) to finance the property and asked if Fleet would discount its mortgage of $5,100,000. On August 30, 1990, Belfonte, through negotiations with Fleet and the Bankruptcy Trustee for Peck, became the owner of Meadows by acquiring all the shares of Meadows from Peck and his wife.
Commercial mortgage required an environmental study of the subject property prior to advancing any funds. On May 10, 1991, Belfonte contracted with Enviroscience Consultants, Inc. (Enviroscience) for an environmental study of the subject property. Defendant's Exhibit C.
On or about June 1991, Belfonte received the Phase I report from Enviroscience and shared its results with Commercial Mortgage and Fleet. The report, dated June 12, 1991, stated that, due to the installation of underground fuel storage tanks from 1965 to 1971, the "probability of leakage and subsurface contamination is high" especially for single-wall steel tanks. The removal and replacement of the tanks was recommended. CT Page 11572 Defendant's Exhibit D, page 11. The estimated cost of eliminating the problem was estimated to be $500,000.
Pursuant to regulations of the Connecticut Department of Environmental Protection in effect in 1987, all storage tanks which were underground for 20 years had to be removed, whether leaking or not. Glen Meadows paid Enviroscience the sum of $148,200 to remove and replace the sixteen underground storage tanks and approximately $218,900 to remove 258,130 tons of contaminated soil. Defendant's Exhibit M, p. 1.
As a result of the Phase I report, Commercial Mortgage would not provide financing to Belfonte. Therefore, he continued to negotiate with Fleet.
The negotiations resulted in a transfer of the subject property from Meadows to Glen Meadows on December 18, 1991. At that time, Fleet, Belfonte, Meadows and Glen Meadows knew of the contents of the Phase I report, supra. Fleet, interested in getting rid of a non-performing loan and the environmental problems on the subject property, agreed to release its $5,100,000 mortgage and to give Glen Meadows a $2,800,000 loan.
Glen Meadows received a credit of $405,782 for fire code violation repairs, replacement of underground tanks, delinquent real estate taxes funding of security deposits, etc. Plaintiff's Exhibit 3. Notwithstanding this credit Glen Meadows gave Fleet a $2,520,000 first mortgage on the subject property.
In determining the true and actual value of rental property if there is insufficient data in a town based on current bonafide sales of comparable property which may be considered in determining such value, the assessor of the town shall include to the extent applicable with respect to such property, consideration of each of the following methods of appraisal:
(1) Replacement cost less depreciation plus the market value of the land;
(2) The gross income multiplier method as used for similar property; and
(3) Capitalization of net income based on market rent for similar property. Connecticut General Statutes § 12-63b. CT Page 11573
 Market rent means the rental income that such property would most probably command on the open market as indicated by present rentals being paid for comparable space. Connecticut General Statutes § 12-63b(b).
The true and actual value of a property is its fair market value. Connecticut General Statutes § 12-63.
Plaintiff's appraiser, Perrelli, did not develop the cost approach due to the inherent difficulty in accurately estimating the accrued depreciation for the subject property and the lack of comparable apartment land sales.
In his determination of the fair market value of the subject property, Perrelli used the direct sales comparison approach and the income approach (direct capitalization). The direct sales comparison approach indicated a fair market value of $2,600,000. Plaintiff's Exhibit 1, pp. 26-35.
Under the income approach, Perrelli estimated a monthly market rental for the units on the subject property by examining five comparable rentals in Norwich, Montville and New London, Plaintiff's Exhibits 1, pp. 37, 38. He then developed an overall capitalization rate of 13.75 percent using a return on equity rate of 15 percent and an effective tax rate factor of .0122. Plaintiff's Exhibit 1, p. 39.
Perrelli established a net operating income of $384,590 by estimating a gross potential annual income of $758,380, and subtracting therefrom vacancy/collection costs of $75,838 (10 percent) and estimated annual expenses of $297,952, excluding any real estate tax deduction. Applying the overall capitalization rate of 13.75 percent to the estimated net operating income, Perrelli obtained an indicated fair market value of $2,797,018, which he rounded out to $2,800,000, for the subject property as of October 1, 1991.
From the values indicated by the direct sales comparison and the income approach, Perrelli deducted $500,000, the estimated cost of correcting the contamination on the subject property caused by the leaking underground storage tanks and arrived at a fair market value for the subject property of $2,100,000 and $2,300,000 respectively, as of October 1, 1991. CT Page 11574
In his expense determination, Perrelli utilized a deduction for advertising, salaries, employee benefit and a management fee of 6 percent of effective gross income and a reserve for replacement of $30,000. Plaintiff's Exhibit 1, P. 40. (The explanation of each expense item is set forth in Plaintiff's Exhibit 1, p. 42.
Perrelli admitted that the comparables he used in the direct sales approach, including the sale of the subject property from Meadows to Glen Meadows, were poor and that the direct sales approach should not be relied upon except as a check against the value indicated by the income approach.
By comparing both approaches, but attributing greater weight to the income approach, Perrelli felt that the fair market value of the subject property was $2,200,000 as of October 1, 1991. Plaintiff's Exhibit 1, p. 43.
Defendant's expert, Wilcox, testified that market research indicated there were few recent sales in Montville of comparable property to the subject property to which a direct comparison could be made. However, he utilized the direct sales comparison approach by including sales throughout New London County and obtained an indicated fair market value for the subject property of $5,272,500 as of October 1, 1991. Defendant's Exhibit 1, pp. 52, 53.
In his final determination of the market value of the subject property, he gave little weight to this approach and greater weight to the income approach he developed as set forth hereinafter. Defendant's Exhibit 1, p. 57.
Defendant's expert, Wilcox, utilized the same income approach used by Perrelli. However, in determining the estimated net operating income, Wilcox utilized market figures gleaned from his personal experience in appraising properties in Eastern Connecticut, which includes the Town, and SABRE/SLF Systems and Service files which include income and expense statements for potential gross income, vacancy/collection loss and estimated operating expenses.
Wilcox, estimating the gross income to be $595,080, subtracted therefrom a vacancy/collection loss of $47,606, (8 percent) an estimated operating expense of $101,164 (18 CT Page 11575 percent of 547,474) excluding taxes and obtained an estimated net operating income of $446,310. Utilizing the Ellwood premise, a mortgage rate of 13 percent, a return on equity rate of 9 percent and a tax factor of 1.4 percent, he developed a capitalization rate of 10.9 percent. Defendant's Exhibit A (erroneously marked Defendant's Exhibit 1), p. 55. Applying the capitalization rate of 10.9 percent to the net operating income, Wilcox obtained an indicated fair market value for the subject property of $4,094,587, rounded out to $4,094,600, as of October 1, 1991. Defendant's Exhibit A, p. 56.
At the request of Fleet Bank, Arnold Grant (Grant), an expert appraiser of real estate, developed a fair market value of $4,730,000 for the subject property as of September 1, 1989, utilizing the income (direct capitalization of income) approach and a sales comparison approach. Defendant's Exhibit N, p. 1. Grant, updating his appraisal utilizing the sales comparison approach and income (discounted cash flow analysis) approach, also an accepted method for determining fair market value, obtained a value of $4,020,000 for the subject property as of September 24, 1990. Defendant's Exhibit N2, p. 5.
In his determination of market value, Grant gave the income approach a weight of 75 percent and the direct sales comparison approach a weight of 25 percent. Defendant's Exhibit N2, p. 5. However, the income approach alone indicated a fair market value of $3,910,000. Defendant's Exhibit N, p. 4.
Grant again updated his appraisal using the income approach (discounted cash flow analysis) and obtained an estimated value of $3,960,000 as of May 28, 1991. However, giving the same weight, as indicated aforesaid, to the income approach and the direct sales comparison approach, he determined the fair market value of the subject property to be $4,050,000 as of May 28, 1991. Defendant's Exhibit N3, pp. 4 and 5.
In his May 28, 1991 update, Grant used lower monthly market rental rates than in his previous appraisals, because he believed that rental rates had fallen in Montville. He projected the rental income and estimated expenses for five years by increasing the rentals by 4 percent per year and the expenses by 5 percent. Defendant's Exhibit N3, pp. 8-12.
Grant did not use the cost approach as he felt that the difficulty in accurately estimating the amount of accrued CT Page 11576 depreciation applicable to the property prevented a sufficiently precise estimate of the value of the property. Defendant's Exhibit N, p. 17. He concluded that the direct sales comparison approach, though theoretically the best method when sufficient date is available, was not a reliable value indicator in 1989. Defendant's Exhibit N, pp. 18 and 19.
The court rejects the results of the direct sales comparison by Grant and Wilcox as there were insufficient comparables to the subject property and that those used were too remote in time to October 1, 1991. The court also rejects the cost approach utilized by Wilcox, and finds that the opinion of Perrelli and Grant, that the cost approach would not yield a sufficiently precise estimate of the value of the subject property, credible.
The defendant claims that Perrelli's determination of the market value of the subject property was erroneous in that (1) the deduction of management fees should include management, advertising and salaries, and that, therefore, a separate deduction of each stated expense is a duplication which results in a lower net operating expense; (2) the tax factor used by Perrelli was inaccurate since the defendant's tax phase-in did not occur until after October 1, 1991; (3) the 15 percent return on equity rate used by Perrelli was higher than the norm used by appraisers as of October 1, 1991; and (4) a 6 percent return on equity rate was more realistic.
From the evidence presented, the court finds (1) that the income approach (direct capitalization) produces the most reliable indication of the fair market value of the subject property for ad valorem tax purposes as of October 1, 1991; (2) that the reserve for replacement of $30,000 is not a proper expense deduction for the determination of net operating income; (3) that the estimated net operating income is $414,590; (4) that the return on equity rate should be 10 percent and the overall capitalization rate should be 12.5 percent.
The application of the capitalization rate of 12.5 percent to the estimated net operating expense of $414,590 indicates a fair market value for the subject property of $3,316,720 as of October 1, 1991.
Plaintiff claims that the granting of a $2,800,000 loan by Fleet to Glen Meadows, minus the credit of $405,782, CT Page 11577 established the true market value of the property as of October 1, 1991.
The court disagrees with the plaintiff's claim for the following reasons:
(1) Market value is the most probable price, as of a specified date, in terms of money, for which a property should sell after reasonable exposure in an open and competitive market under all conditions requisite to fair sale, with the buyer and seller each acting prudently, knowledgeably, and for self interest, and assuming that neither is under duress.
(2) The subject property had not been listed for sale with any real estate company or broker prior to the sale and had not been reasonably exposed in an open and competitive market for its sale. Plaintiff's Exhibit 7, pp. 48, 49.
(3) Meadows and Glen Meadows, the seller and buyer, were owned and controlled by Belfonte.
(4) Grant, Fleet's expert, had determined that the fair market value of the subject property was $4,050,000 as of May 1, 1991, approximately seven months prior to the transfer of the subject property from Meadows to Glen Meadows on December 18, 1991.
(5) Fleet was not the seller or buyer of the subject property.
(6) On October 17, 1991, the subject property was insured for $3,988,000. (Defendant's Exhibit B.)
(7) The totality of the circumstances, such as Peck's involuntary bankruptcy; the total indebtedness of Peck and Belfonte to Fleet, the existence of a non-performing loan of $5,100,000; the probability of contamination of the subject property from the leaking underground storage tanks; the recommendation that the tanks be removed and replaced may have influenced Fleet's decision to discount its mortgage, not as an indication of market value, but as a desire to rid itself of a non-performing loan with little, if any, possibility it could be collected.
Plaintiff claims, therefore, that it is entitled to a CT Page 11578 reduction of $500,000 in the value of the subject property pursuant to Connecticut General Statutes § 12-63e because of the contamination and pollution problems existing on the subject property.
Section 12-63e provides, inter alia, ". . . that the assessors of a municipality shall not reduce the value of any property due to any polluted or environmentally hazardous condition existing on such property if such condition was caused by the owner of the property or if a successor in title to such owner acquired such property after any notice of the existence of any such condition was filed on the land records in the town where the property is located. . . . An owner shall be deemed to have caused the polluted or environmentally hazardous condition if the department of environmental protection, the United States Environmental Protection Agency or a court of competent jurisdiction has determined that such owner caused such condition or a portion of it."
No evidence was offered to show that the notice required by § 12-63b was filed in the Montville land records or that any applicable court or agency determined that an owner caused such condition or a portion of it, or that the plaintiffs caused such condition or a portion of it.
Although no such notice was filed on the defendant's land records, the defendant claims that the plaintiffs knew or should have known of the leaking underground storage tanks on or about June 12, 1991, because of the Phase I Environmental Site Assessment Report of Enviroscience Consultants, Inc., which stated that there was a probability of contamination of the subject property from the leaking underground storage tanks. Defendant's Exhibit D, p. 11. As previously stated, Commercial Mortgage refused to give plaintiffs a mortgage as a result of said report.
Although Connecticut General Statutes § 12-63e
prohibits an assessor of a municipality from reducing the value of property because of pollution or contamination of the property unless certain conditions exist, one of which is notice of such condition on the land records of the municipality, § 12-63e does not bar this court from such reduction if the court finds that the owner or prospective buyer of the property did not have actual or constructive knowledge of the contamination or pollution or from disallowing such reduction if CT Page 11579 the owner or prospective buyer had such knowledge.
In this matter, the court finds that the plaintiffs knew or should have known of the probability of leaking underground storage tanks and the recommendation that the tanks should be removed and replaced from the Phase I report of Enviroscience Consultants, Inc. Defendant's Exhibit D. Accordingly, the cost of removing and replacing the underground storage tanks and eliminating said contamination shall not be allowed as a deduction from the value of the subject property.
The court concludes that the fair market value of the subject property as of October 1, 1991, and the years thereafter involved in this appeal, is $3,316,720. Therefore, Plaintiff's appeal is sustained and the defendant is ordered to refund or credit to the plaintiffs any excess taxes which may have been paid by the plaintiffs.
Paul M. Vasington State Trial Referee